*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

ANTHONY NAVARRE,

Plaintiff-Appellant,

v

SAGINAW COUNTY COMMUNITY MENTAL
HEALTH AUTHORITY,

Defendant-Appellee.

UNPUBLISHED
May 12, 2025
11:11 AM

No. 371268
Saginaw Circuit Court
LC No. 23-000572-CD

Before: O'BRIEN, P.J., and K. F. KELLY and BORRELLO, JJ.

PER CURIAM.

In this case, involving a claim of employment discrimination based on race, plaintiff appeals by right the trial court's order granting defendant Saginaw County Community Mental Health Authority's (SCCMHA) motion for summary disposition under MCR 2.116(C)(10) and dismissing plaintiff's complaint with prejudice. For the reasons set forth in this opinion, we affirm.

## I. BACKGROUND

This action under the Elliott-Larsen Civil Rights Act (ELCRA), MCL 37.2101 *et seq.*, revolves around plaintiff's contention that he was denied a promotion in favor of another employee based on unlawful racial discrimination. Plaintiff, who is white, began working at SCCMHA in 2015 as a recipient rights advisor and investigator. He remained in that position until January 2022, when he took another position with SCCMHA as a provider network auditor. Plaintiff testified in his deposition that he had applied for the auditor position because he was "burnt out and needed a change."

Kentera Patterson, an African American, began her tenure at the Saginaw County Community Mental Health Authority (SCCMHA) in January 2020, taking on the role of support coordinator case manager. After approximately one year, she transitioned to the position of recipient rights advisor and investigator, where she worked alongside plaintiff, both reporting directly to Tim Ninemire, their immediate supervisor. Patterson testified that her training for this role was provided by plaintiff, Ninemire, and Melynda Schaefer, the previous incumbent. Plaintiff

asserts that he trained Patterson as well. Patterson remained in the recipient rights advisor role for about a year before advancing to a supervisor role focused on customer service and recipient rights.

In May 2022, SCCMHA announced a vacancy for the manager of compliance, security, and privacy. The position's requirements initially included a master's degree and five to ten years of relevant experience. Amy Lou Douglas, the Chief Information Officer and Chief Quality and Compliance Officer at SCCMHA, indicated that no suitable candidates emerged; consequently, the decision was made to remove the security responsibilities from the role and repost it as manager of compliance and privacy. The revised posting for the manager of compliance and privacy required a bachelor's degree and five years of relevant experience, eliminating the master's degree requirement.

Both plaintiff and Patterson applied for the newly created position. Plaintiff possessed two bachelor's degrees—one in communication and the other in human services—but lacked a master's degree. Conversely, Patterson held a bachelor's in criminal justice and a master's in public administration. Douglas, as the hiring manager for the role, decided to interview both candidates since they met the minimum qualifications. Post-interview, Douglas assessed that plaintiff was not a suitable candidate for the role. She noted that his experience as an investigator did not encompass enough breadth to meet the operational needs of the compliance officer position. Douglas explained that the compliance role required an expansive understanding of the agency's entire operational scope. In contrast, she determined that Patterson's diverse roles within the organization provided her with a more comprehensive understanding of the agency's operations.

On September 19, 2022, plaintiff emailed the Human Resources Recruitment department, inquiring about the status of his application after interviewing with Douglas on July 27, 2022. Laura Atkinson, a human resources specialist, relayed this message to Douglas, asking for guidance on how to respond. Douglas replied, indicating that while a decision was still pending, plaintiff was not a good fit and instructed Atkinson to proceed with issuing a rejection letter. On September 21, 2022, Atkinson communicated with plaintiff, stating that they were awaiting final decisions from Douglas and administration, assuring him that he would receive an update in a few days. Plaintiff then responded, expressing gratitude for the clarification but asserting his desire to withdraw from consideration for the position at that time.

Douglas later acknowledged that she was still deliberating on the position's future during the period of these exchanges, despite having already decided to reject plaintiff's candidacy. Ultimately, a formal rejection letter was never issued because plaintiff voluntarily withdrew from consideration.

Plaintiff provided an explanation for his decision to withdraw, outlining his reasoning thusly:

> *Q.* Why did you remove your name from consideration?

*A*. I was frustrated with Amy Lou because I had all these high expectations. There was literally two people who applied for the position: Myself and Kentera. This was two months – it was 56 days later and they still had not made the decision.

So it was at that point – because we had been hearing about this DEI in Michigan and how they were going to try to diversify the work force. So I was frustrated with Amy Lou because I thought she was a straight shooter.

I had just come to the realization that they were actually going to hire somebody -- they were going to hire Kentera based on her race over myself, based on my race, even though I feel that I have the qualifications and my experience is so much greater that if they still couldn't make up their mind after two months, I wasn't going to play that game any more [sic]. So it was mostly out of frustration. But we were already made aware of the DEI initiative.

So I was just not -- I was done. I was not going to play that game anymore.

*Q*. Did you talk to anybody in management before you made the decision to withdraw your application?

*A*. No.

*Q*. At that point in time what, had you been hearing about DEI? By DEI you mean: Diversity, equity and inclusion. Correct?

*A*. That is correct. Well, we had heard that the agency had been -- had a Lawsuit prior to this and as part of that, the correction for that, they were hiring a person to come in to teach DEI. So and the gentleman's name was Dr. Paul Elam. So his name had been floated out there.

I was convinced the only reason they wouldn't give me the position, based on my experience and everything that I had done, is that this was going to be the first of hire based on race, you know. So they were going to make me the example of the company.

But we had heard that there was a full lawsuit when somebody didn't get the position based on their race and this was -- the corrective action was: Now we're going to go the exact opposite way. So a white Caucasian like myself would not get the job based on my race.

However, plaintiff was subsequently asked, "Did anyone say that is what they were going to do; not hire a white Caucasian in favor of a minority?" Plaintiff responded, "Nobody said that to me." The following exchange also occurred during plaintiff's deposition:

*Q*. So they never said they were going to then make hiring decisions based on race, correct? Nobody ever said that in the course of this DEI program?

*A*. Nobody ever said that to me.

*Q.* What was it about the fact that there was a delay in making a decision on the Manager of Compliance and Privacy position that made you think that, it had something to do with DEI or race?

*A.* Just based on the fact that my overall experience, at the time 31 years in the mental health field -- 1991 was 30 or 31 years -- compared to her, my experience alone, the fact that I had trained her that -- the evidence -- I don't want to say I felt.

It was just evident to me that my qualifications were so much better that the only reason there was a delay is they had to prolong the decision because they couldn't figure out how they could give her that position. And the only reason they wanted to give it to her was based on her race.

At one point, Ninemire announced his intention to retire from his role as the director of customer service, recipient rights, and security. This was an executive-level position, with Sandra Lindsey, the CEO of SCCMHA, serving as his direct supervisor. Lindsey regarded Ninemire's announcement as a significant turning point. Since no candidate had yet been identified for the manager of compliance and privacy position, Lindsey opted to restructure this role to incorporate responsibilities that had previously been part of Ninemire's job. The position was subsequently renamed the officer of recipient rights and compliance. While Lindsey preferred candidates for the executive team to hold advanced degrees, it appeared that some current members did not possess such qualifications. Remarkably, the officer of recipient rights and compliance position was never publicly posted. During her deposition, Lindsey was asked about the rationale behind the decision not to advertise this role.

*Q.* Are you aware of Policy 302 that says all internal job vacancies will be posted?

*A.* I don't – I don't have it in front of me nor do I know the number, but I know that policy exists.

*Q.* Do you know was there a decision made about not posting the officer of recipient rights and compliance position?

*A.* Yes.

*Q.* What do you recall from that discussion?

*A.* The discussion was that we combined or changed the scope or the responsibilities for the position. We had a supervisor deserving of a promotion, who had also been viewed the top applicant in the compliance area, and so as we were reorganizing it made a lot of sense to move forward with Kentera Patterson. However, there were requirements that nobody met in the compliance section of responsibilities in terms of healthcare certification that required ultimately a job offer that had conditions.

*Q.* Okay. So what exactly was the rationale? Was the reason why it wasn't posted because it just made sense for the position?

-4-

*A.* Yes, it just made sense. She was the only compliance applicant remaining. She was already supervising rights.

Tim Ninemire had a high level of confidence in her ability as did I, because I had been dealing with her when Tim was on medical, and I we had the rest of Tim's responsibility that, as I mentioned were reorganized into another position that was also not posted . . . . [1]

In a letter dated October 31, 2022, SCCMHA extended an offer for the officer of recipient rights and compliance position to Patterson. The letter informed Patterson that she would have a two-year "transitional period to allow time to complete trainings and certifications required for this position," during which time Patterson would "have a matrixed reporting relationship between the Director of Recipient Rights and Chief Quality and Compliance Officer." After successfully completing the training and transition period, Patterson would report directly to the CEO. Patterson accepted the position on November 4, 2022.

The record contains a job description for the officer of recipient rights and compliance position, but this job description does not appear to contain a date. However, plaintiff submitted a SCCMHA internal document that appears to indicate the position was newly added in November 2022. The listed qualifications include a master's degree, five years of relevant experience, and the requirement to "possess or acquire within 2 years and maintain a Certification in Healthcare Privacy Compliance (CHPC) or another Compliance related certification that is applicable to position."

On March 20, 2023, plaintiff filed this action against the SCCMHA, alleging that SCCMHA violated § 202(1)(a) of the ELCRA by failing to hire him for the Officer of Recipient Rights and Compliance position on account of his race. Plaintiff alleged that he was qualified for the position and that SCCMHA selected a less qualified and less experienced person for the position based on her race as part of SCCMHA's efforts to diversify its workforce. Plaintiff subsequently resigned from his employment with SCCMHA.

SCCMHA moved for summary disposition under MCR 2.116(C)(10), arguing that plaintiff could not establish a prima facie case of discrimination and that SCCMHA had legitimate, non-discriminatory reasons for its promotion decision. As specifically relevant to the issue on appeal, SCCMHA argued that plaintiff had no direct evidence of racial discrimination and could not establish a prima facie case from which discrimination could be inferred because there was no evidence that plaintiff was qualified for the officer of recipient rights and compliance position—which required a master's degree that plaintiff did not possess—and the mere fact that SCCMHA selected another qualified candidate does not give rise to an inference of discrimination. SCCMHA maintained that plaintiff could not demonstrate that he was rejected in favor of a less qualified candidate, and SCCMHA further emphasized that plaintiff had withdrawn his name from consideration before the position was offered to Patterson.

---

[1] The other position that was not posted was a director level position, not an executive level position.

-5-

In opposition, plaintiff argued that he was qualified for the position because he met the minimum qualifications for the manager of compliance and privacy position and he interviewed for that position. Plaintiff further argued that even though he lacked the master's degree required for the officer of recipient rights and compliance position, Patterson was also not qualified for that position as evidenced by the two-year transition period she required in order to obtain necessary certifications. Regarding an inference of discrimination, plaintiff argued that he and Patterson were similarly qualified considering plaintiff's particular experience such that the prima facie inquiry was satisfied. Plaintiff maintained that the SCCMHA's proffered reasons for hiring Patterson were pretexts for racial discrimination.

The trial court conducted a hearing on the motion and subsequently granted SCCMHA's motion for summary disposition, determining that plaintiff failed to establish a prima facie case of racial discrimination as delineated by the *McDonnell Douglas* burden-shifting framework. The court specifically identified deficiencies in meeting the third and fourth elements requisite for a prima facie case of discrimination. It found that plaintiff was not qualified for the position of Officer of Recipient Rights and Compliance due to his lack of the mandatory master's degree, which constituted a minimum qualification for the role. The court concluded that there was no factual dispute regarding this qualification, as plaintiff did not possess a master's degree. Furthermore, the court assessed the fourth element and determined it was not satisfied, as the position was not awarded to another individual in circumstances that would suggest unlawful discrimination. It was noted that the plaintiff had previously withdrawn his application for the original position of Manager of Compliance and Privacy. The court highlighted that Patterson, who was awarded the position, met the minimum qualifications and had received a higher rating in the interview process. Additionally, the court emphasized that there was insufficient evidence to support the claim that the master's degree requirement was included in the job description as a means to discriminate against plaintiff on the basis of race. Consequently, the trial court issued an order granting summary disposition in favor of SCCMHA and dismissing the complaint for the reasons articulated on the record. This appeal followed.

## II. STANDARD OF REVIEW

This Court reviews a trial court's ruling on a motion for summary disposition de novo. *Maiden v Rozwood*, 461 Mich 109, 118; 597 NW2d 817 (1999). Summary disposition is appropriate under MCR 2.116(C)(10) if "[e]xcept as to the amount of damages, there is no genuine issue as to any material fact, and the moving party is entitled to judgment or partial judgment as a matter of law." MCR 2.116(C)(10). When considering a motion under MCR 2.116(C)(10), the court "must consider all evidence submitted by the parties in the light most favorable to the party opposing the motion." *El-Khalil v Oakwood Healthcare, Inc*, 504 Mich 152, 160; 934 NW2d 665 (2019). "A genuine issue of material fact exists when the record leaves open an issue upon which reasonable minds might differ." *Id*. (quotation marks and citation omitted).

## III. ANALYSIS

Section 202(1)(a) of the ELCRA, MCL 37.2202(1)(a), provides in relevant part that an "employer shall not . . . [f]ail or refuse to hire or recruit, discharge, or otherwise discriminate against an individual with respect to employment, compensation, or a term, condition, or privilege of employment, because of . . . race . . . ."

Our Supreme Court has explained that in cases such as this one where there is no claim that direct evidence of unlawful discrimination exists, a "plaintiff must then proceed through the familiar steps set forth in [*McDonnell Douglas Corp v Green*, 411 US 792, 802-803; 93 S Ct 1817; 36 L Ed 2d 668 (1973),]" to avoid summary disposition. *Hazle v Ford Motor Co*, 464 Mich 456, 462; 628 NW2d 515 (2001). Under the *McDonnel Douglas* framework, plaintiff "must first offer a 'prima facie case' of discrimination." *Id*. at 463. To make a prima facie case, plaintiff was required to produce evidence that (1) he belonged to a protected class, (2) he suffered an adverse employment action, (3) he was qualified for the position, and (4) "the job was given to another person under circumstances giving rise to an inference of unlawful discrimination." *Id*. A presumption of discrimination arises upon the successful establishment of a prima facie case, which may be rebutted by evidence that the employment decision was made for a legitimate, non-discriminatory purpose. *Id*. at 463-465. "At that point, in order to survive a motion for summary disposition, the plaintiff must demonstrate that the evidence in the case, when construed in the plaintiff's favor, is sufficient to permit a reasonable trier of fact to conclude that discrimination was a motivating factor for the adverse action taken by the employer toward the plaintiff." *Id*. at 465 (quotation marks and citation omitted). "[A] plaintiff must not merely raise a triable issue that the employer's proffered reason was pretextual, but that it was a pretext for [unlawful] discrimination." *Id*. at 465-466 (quotation marks and citation omitted; second alteration in original).

In this matter, the trial court determined that plaintiff failed to establish a prima facie case of discrimination. We note from the outset that the appellate issues concerning whether the SCCMHA could present a legitimate, non-discriminatory rationale for its actions, and whether any such rationale was merely a façade for unlawful discrimination, are not contested in plaintiff's appeal. The trial court unequivocally concluded that plaintiff did not meet the third and fourth elements requisite for a prima facie case of discrimination. On appeal, SCCMHA acknowledges that the initial two criteria—namely, plaintiff's status within a protected class and the existence of an adverse employment action—were fulfilled (Appellee's Brief on Appeal, p. 12). Consequently, our analysis will concentrate solely on the third and fourth elements.[2]

Plaintiff asserted in his complaint that SCCMHA engaged in adverse employment actions by declining to hire him for the Officer of Recipient Rights and Compliance position (Complaint, ¶ 64). It is indisputable that the requisite qualifications for this role included holding a master's degree, which plaintiff did not possess. Therefore, he was not qualified for this position and, as a matter of law, could not establish a prima facie case of racial discrimination, as articulated in *Hazle*, 464 Mich at 463.

Regarding the fourth element, the record indicates that both plaintiff and Patterson interviewed for the manager of compliance and privacy position. Following the interviews, Douglas assessed Patterson's specific work experience as superior to plaintiff's, indicating greater

---

[2] Notably, although plaintiff voluntarily removed himself from consideration for the initial promotion, seemingly negating the second factor in the *McDonnel Douglas* framework, appellee concedes in their appeal that plaintiff met the second prong rather than make an argument based on plaintiff's voluntary removal from consideration.

qualifications for the role. While plaintiff contends that his experience made him more suitable, simply opting between two qualified candidates does not inherently suggest unlawful discrimination. In such contexts, a reasonable inference may be drawn that the employer selected the candidate perceived as most qualified for the position (*Id*. at 471). Notably, plaintiff voluntarily withdrew his application during this process. With plaintiff's withdrawal, Patterson became the sole candidate for the vacancy. Following the announcement of Ninemire's impending retirement, Patterson was subsequently offered a role under a different title with altered responsibilities and qualifications. As previously noted, plaintiff did not fulfill these new qualifications. Although plaintiff argues that the adjustments made to the position's requirements were intended to exclude him, this notion is untenable considering his voluntary withdrawal from the candidate pool prior to the adjustments being made. During his deposition, plaintiff alleged that he withdrew his application due to a belief that the delay in filling the position was racially motivated against him in favor of Patterson; however, he conceded that no evidence indicated that racial factors played a role in the decision-making process for the position's appointment. Under these circumstances, plaintiff has failed to demonstrate a legitimate question of fact suggesting that Patterson was awarded the Officer of Recipient Rights and Compliance position under circumstances indicative of unlawful discrimination (*Id*. at 463).

Lastly, plaintiff's argument that Patterson was not qualified for the officer position due to her two-year transition period for obtaining necessary certifications misconstrues the job qualifications. The job specification explicitly required candidates to "possess or acquire within two years and maintain a Certification in Healthcare Privacy Compliance (CHPC) or another relevant Compliance certification applicable to the position." This provision aligns with the hiring process, allowing Patterson the requisite time to achieve the necessary certifications that she initially lacked, whereas no such explicit provision concerning the educational qualifications was included in the job description.[3]

Patterson was not afforded a two-year window to acquire the master's degree that the plaintiff lacked, as she already possessed a master's degree. Consequently, plaintiff's assertion does not substantiate the claim that Patterson received preferential treatment. While plaintiff fundamentally disputes SCCMHA's employment decision, believing subjectively that he would have been a more suitable candidate for the role than Patterson, it is important to note that plaintiff cannot merely demonstrate that the employer's decision was erroneous or flawed, as the critical issue in contention is whether discriminatory intent influenced the employer's choice. The

---

[3] The job description did, however state:

> Listed qualifications are for guidance in filling this position. Any combination of education and experience that provides the necessary knowledge, skills, and abilities will be considered; however, mandatory licensing or certification requirements cannot be waived. Physical/mental requirements cannot be waived unless specifically indicated.

Hence, it appears that SCCMHA had the discretion to consider whether a candidate's combination of education and experience was equivalent to possessing a master's degree. However, because plaintiff had already removed himself from consideration, this fact does not change our analysis.

evaluation should therefore focus on whether the employer acted with bias—not on the wisdom, shrewdness, or competence of the decision itself. Furthermore, employers are obligated to assess their employees based on merit, considering the context of the business at the time of evaluation, rather than on any discriminatory grounds. Ultimately, plaintiff has not succeeded in proving that the trial court erred in granting summary disposition in favor of SCCMHA on the basis that he failed to establish a prima facie case of racial discrimination. *El-Khalil*, 504 Mich at 160.

Affirmed.

/s/ Colleen A. O'Brien
/s/ Kirsten Frank Kelly
/s/ Stephen L. Borrello